# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON | No. 55821-1-II |
| Respondent, | |
| v. | |
| SHANE DANIEL BREWER, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.— Shane Daniel Brewer broke into a Big 5 Sporting Goods store and stole four guns. The guns all had plastic trigger locks that prevented them from being fired. Brewer later murdered Loren VerValen in VerValen's home using one of the guns and stole his car. Police found VerValen's car at Brewer's house and tried to contact Brewer. When Brewer proved evasive, police sought warrants for information from cell providers to track his phones, as well as cell site location information about the phones' locations at the time of the murder.

The State ultimately charged Brewer with 12 counts, including in part first degree murder, first degree robbery, first degree burglary, and three counts of first degree unlawful possession of a firearm. The murder, robbery, and burglary charges all had firearm sentencing enhancements. Before trial, a judge denied Brewer's motion to suppress cell site location information from his phones at the time of the murder.

A jury convicted Brewer of 10 charges including the burglary, but it could not reach a verdict on the murder or robbery. The jury found that Brewer was armed with a firearm during the burglary, despite the trigger locks.

At a second trial, a State witness reported symptoms consistent with COVID-19. The trial court ruled that the witness was unavailable under ER 804 and, with the agreement of the parties, ordered his testimony from the first trial read to the jury. In closing argument, the State commented on an attempt by Brewer to avoid contact with police. Brewer objected, arguing this was a comment on prearrest silence, and the trial court instructed the jury to disregard the comment. Brewer then moved for a mistrial, and the trial court denied the motion. The jury convicted Brewer of first degree murder and first degree robbery.

Brewer appeals. He argues there was not probable cause to support the warrants for information from cell providers and the trial court should have suppressed that evidence. He contends there was insufficient evidence to support his conviction for first degree burglary and the attached firearm sentencing enhancement because the stolen guns had trigger locks, so he was not armed. He asserts that the trial court violated the confrontation clause by admitting the unavailable witness's prior testimony. He also argues the State's comment on his attempt to avoid contact with police was prosecutorial misconduct, and the trial court should have granted the motion for a mistrial. Brewer has also filed a statement of additional grounds for review (SAG).

We affirm Brewer's convictions and sentence.

FACTS

Brewer was friends with VerValen's roommate and knew that VerValen bought and sold stolen goods. Late on the night of December 20, 2018, Brewer told VerValen's roommate in a Facebook message that he had "plan[s] . . . Like [a] big p[a]yday." Ex. 511, at 2, 3.

Hours later, on December 21, 2018, around 3:00 a.m., a Big 5 sporting goods store in Olympia was burglarized. The burglar disabled a security camera with bolt cutters that were also

used to cut through a steel gun rack. The burglar stole four guns plus several boxes of ammunition. Around 6:00 a.m. that morning, Brewer sent VerValen's roommate a message on Facebook asking if VerValen "still want[ed] brand new clean things." *Id*. at 7.

Police officers visited VerValen's property three times the following day, trying to contact VerValen's roommate in an unrelated matter. The first visit was around 6:00 a.m. Police arrived for the second visit around 8:30 a.m. On that visit, a police officer saw the driver's door of VerValen's Ford Mustang was open and the car was filled with items, including a chainsaw, toolkit, and table saw. The officer knew the Mustang was VerValen's because of an encounter the day before. At 9:00 a.m. Brewer sent a Facebook message to a friend stating that he was "in a bind" and "need[ed] the fuzz out of here." Ex. 511, at 25-26. Police left VerValen's house around 9:15 a.m.

Police visited VerValen's home for the third time shortly before noon. On this visit, police met VerValen's girlfriend, who entered VerValen's house and discovered his body in his bedroom. The cause of death was three gunshot wounds to the torso.

VerValen's house had been ransacked and a surveillance system inside was missing. VerValen's Mustang was also missing. A Honda Accord registered to Brewer's parents was parked in front of the house. The Honda was not present when police visited the property earlier that morning and VerValen's girlfriend did not recognize it. Law enforcement requested a warrant to search the Honda, which was denied.

Brewer later tried to sell items missing from VerValen's home, including VerValen's chainsaw and table saw, on the Internet.

3

## I. INVESTIGATION

VerValen's roommate, who was a person of interest in the case, had an alibi for the morning of the murder and voluntarily contacted police to clear his name.

When police contacted Brewer, he told police that he had spent the night of the murder drinking with VerValen's neighbor and left his car overnight to avoid driving drunk. The neighbor denied knowing or ever meeting Brewer.

A few days later, police received a tip that VerValen's Mustang was at Brewer's house. Brewer was not home. Police obtained a warrant to search the house and garage. They found two guns, ammunition, and a pair of bolt cutters in Brewer's garage. They also found price tags linking the guns to the Big 5 burglary. When police called Brewer, he said he was working in Seattle and gave them his boss's contact information. However, Brewer's boss told police that Brewer was at home working on a truck.

On December 23 and December 27, 2018, police sought two warrants for cell provider records related to two cell phone numbers Brewer used in communications with them. Police sought trap and trace and pen register information that would give live information on the phones' locations, as well as text messages, call records, and cell site location information from the preceding month.

In an affidavit supporting the requests for the warrants, a detective specializing in computer crimes documented his experience and summarized the facts of the case. The detective explained that the Honda Brewer drove appeared at VerValen's home between police visits on the morning VerValen was murdered. VerValen's Mustang also disappeared between visits. A neighbor observed the Mustang leaving the area shortly after law enforcement's second visit. The affidavit

stated that the Mustang was found at Brewer's residence. Terry Sortino, who was dating one of Brewer's neighbors, told police that Brewer asked if he knew how to remove identification numbers from vehicles and said, "[H]e had to kill a guy to get [the Mustang]." Clerk's Papers (CP) at 76. The affidavit also stated that officers found "suspected stolen items and firearms" at Brewer's house but could not locate Brewer himself. CP at 76. The affidavit explained that Brewer had contacted police from two different phone numbers. Live locations of the phones would help locate Brewer, while cell site location, call, and text records would show the phones' locations around the time of the murder, which might corroborate witness statements. A judicial officer approved each warrant.

The live tracking of Brewer's phones led police to a house owned by some of Brewer's friends. Brewer's Honda was at the house and police acquired a warrant to search it, finding face coverings and ammunition. A third gun from the Big 5 burglary was found hidden in the house after the owner consented to a search. A K-9 unit located Brewer in the woods near the house. He was carrying two backpacks of camping gear and two phones. Brewer told police VerValen had sold him the Mustang, but Brewer never produced a bill of sale. One of Brewer's phones had been reset and another had been damaged so law enforcement was not able to obtain any information from either device.

The State charged Brewer with first degree murder, first degree robbery, three counts of first degree unlawful possession of a firearm, first degree burglary, four counts of theft of a firearm, second degree malicious mischief, and possession of a stolen motor vehicle. The murder, robbery, and burglary charges all had firearm sentencing enhancements.

5

## II. SUPPRESSION HEARING

Before trial, Brewer moved under CrR 3.6 to suppress the information obtained from the cell phone records. He did not contest the portion of the warrants that allowed police to track his live location.

In his motion, Brewer argued that the warrants were overbroad because law enforcement failed to establish a nexus between the items to be searched (the phone records associated with the two phone numbers) and the murder. Brewer claimed the affidavits did not "establish probable cause to believe there is any evidence related to the murder on the phones associated with Mr. Brewer." CP at 94. Specifically, there was "no report or evidence to suggest the phones were at the scene of the murder," and "no evidence of communication relat[ed] to the murder on either device." CP at 94.

In response, the State reviewed the evidence that placed Brewer near the location of the murder on the morning VerValen was killed. In addition, there was evidence Brewer used two phones associated with the two numbers in the warrant in the hours and days after the murder. "Brewer was actively using both telephone numbers[] and . . . cell phones are often kept on one's person." CP at 148.

The trial court found dispositive the detective's assertion that the telephone service provider records would "'show communication and location on or about [when the]' . . . 'homicide occurred to further corroborate witness[es]' statements.'" Verbatim Rep. of Proc. (VRP) (Oct. 7, 2019) at 38. There was a sufficient nexus between information about Brewer's phones' locations at the time of the murder and evidence regarding the murder because "it is well known that individuals keep their cell phones on or about their persons at all times, and as a result, a person's

location or close location may be determined through the use of cell phone records." *Id*. at 41. The trial court denied Brewer's motion to suppress.

III. First Trial

A.    Evidence of Burglary

At trial, the lead detective on the murder testified that when she called Big 5 about the guns in Brewer's garage, she learned those weapons and two others had been stolen the morning before VerValen's murder. A third stolen gun, which was the murder weapon, was recovered from the address next to where Brewer had been hiding in the woods. The fourth gun was never recovered.

Brewer ultimately did not contest that he was guilty of second degree burglary. Security footage from Big 5 showed that Brewer, who was wearing a mask, removed the guns from the store and then came back to steal ammunition. The store manager testified that guns in the store were not loaded and had trigger locks on them. The trigger locks were two pieces of hard plastic that locked together over the triggers to prevent the guns from being fired. A gun could be fired as soon as the trigger lock was removed and the weapon was loaded. Brewer did not steal the trigger lock keys in the burglary and there was no security footage of the locks being opened inside the store. The detective testified she could open a trigger lock with a bobby pin from her hair.

B.    Sortino's Testimony

Sortino testified at the first trial. He explained that several days after the murder, Brewer asked him for help removing a dent and vehicle identification numbers from the Mustang. While Sortino examined the Mustang, Brewer had a fight with his fiancée inside the house and returned outside upset and agitated. Brewer "came out and . . . hit his truck . . . and he said 'I killed the

motherf[***]er' over and over. . . . He said 'That's his car. I murdered the mother[***]er and this is the car.'" VRP (Mar. 2, 2020) at 1091-92.

Sortino did not know VerValen, but was dating the aunt of VerValen's roommate at the time of VerValen's murder. The aunt was Brewer's neighbor. On cross-examination, Sortino acknowledged that when he contacted police, he tried to remain anonymous including not providing his name or connection to VerValen's roommate, because he "didn't want to get involved." *Id*. at 1097.

C.    Closing and Verdict

To convict Brewer of first degree burglary, the jury had to find that Brewer entered or remained unlawfully within a building with intent to commit a crime therein. They also had to find that Brewer or an accomplice "was armed with a deadly weapon" while "entering or while in the building or in immediate flight from the building." CP at 449.

In closing, defense counsel conceded guilt on some of the charges, including second degree burglary. But counsel argued that the trigger locks on the stolen guns prevented Brewer from being armed with deadly weapons as required to support a conviction for first degree burglary. Defense counsel also conceded guilt on second degree malicious mischief, possession of a stolen vehicle, and the four counts of theft of a firearm.

The jury convicted Brewer of first degree burglary and entered a special verdict finding that he was armed with a firearm at the time of the burglary. The jury also convicted Brewer of three counts of first degree unlawful possession of a firearm, four counts of theft of a firearm, second degree malicious mischief, and possession of a stolen vehicle. The jury could not reach a

verdict on the murder or robbery charges. The trial court declared a mistrial on those two charges. Brewer had another trial on the first degree murder and first degree robbery charges.

IV. SECOND TRIAL

A.    Cell Phone Location Evidence

At Brewer's second trial, a forensic computer examiner testified about the cell site location information from Brewer's cell provider's records. He explained how this information can identify where a phone was within a certain radius on a map. The State offered several exhibits depicting the area where Brewer's phone was located on the morning of the murder. Shortly before 8 a.m., one of the phones was within 25 meters of VerValen's home. The same phone was pinged three times in nine seconds around 9:37 a.m. that morning, twice within 50 meters of VerValen's house and once within 25 meters.

B.    Sortino's Testimony

The day he was supposed to testify at the second trial, Sortino reported coughing, a fever, and fatigue. He had not been vaccinated for COVID-19 and had not tested himself for the disease. After a hearing where both parties examined Sortino under oath over the phone, defense counsel agreed that Sortino was unavailable to testify in person but wanted him to testify telephonically. If the trial court found telephonic testimony inappropriate, then defense counsel stated that under ER 804, "a reading of the transcript [from the first trial] would be the alternative." VRP (Apr. 27, 2021) at 1524.

The trial court found Sortino unavailable because of physical infirmity under ER 804(a)(4). The trial court then asked for defense counsel's preference for delivering Sortino's testimony. Defense counsel repeated his request that Sortino testify telephonically and agreed to waive "any

argument with respect to confrontation because that's my preferred method of proceeding." *Id*. at 1527. Counsel then stated, "Obviously, if the Court and Mr. Sortino cannot accommodate that, then I think the reading of the transcript is appropriate." *Id*.

After a recess where the parties continued to explore the logistics of telephonic testimony, the State reported that Sortino did not have a computer or access to video-call technology. The State also expressed concerns about how the parties would deal with exhibits should Sortino testify remotely. Defense counsel then retreated from his suggestion of telephonic testimony, explaining, "I think if we were to go down that route [of telephonic testimony] we're going to end up in a situation where it could present issues that are unnecessary, in my opinion. Mr. Sortino testified subject to my cross-examination about a year ago." *Id*. at 1535. Defense counsel then asked the trial court to admonish the jury not to draw any inferences from Sortino's nonappearance and the reading of the transcribed testimony.

The trial court again ruled that Sortino was unavailable under ER 804(a)(4) and allowed the introduction of his testimony from the first trial via a redacted transcript. It noted that Brewer's right of confrontation was protected because "Mr. Sortino's testimony was at a prior trial and, as a result, he was subject to cross-examination" from Brewer's counsel. *Id*. at 1538. After the trial court admonished the jury not to draw any inferences from Sortino's absence, Sortino's testimony from the first trial was read into the record, including his cross-examination. The jury also received an agreed jury instruction directing them "to draw no inferences or reach any conclusions from Mr. Sortino not being present to testify in person in this trial." VRP (Apr. 28, 2021) at 1649.

C.      Defense Case

One of Brewer's neighbors who testified for the State in the first trial also testified for Brewer in the second trial. The neighbor testified that the morning of the murder, in "the earlier part of the morning," Brewer asked for his help buying a Christmas tree. *Id*. at 1601. Brewer then asked the neighbor to go to VerValen's neighborhood pick up his car. The neighbor testified that as they approached VerValen's house, "we noticed there was a police vehicle ahead and they were starting to put out [crime scene] tape. So then we decided to turn around and go back home and deal with it another time." *Id*. at 1600.

D.      Closing Arguments and Motion for Mistrial

In closing, defense counsel again conceded that Brewer had burglarized the Big 5 and stolen VerValen's property. But counsel argued that VerValen's roommate killed him before Brewer arrived at VerValen's house. Counsel relied in part on the testimony from Brewer's neighbor about the trip to get a Christmas tree: "Do you think if my client just murdered somebody he's going to be acting normal five minutes later when he gets in the car with [his neighbor] when he goes to get his Christmas tree?" VRP (Apr. 29, 2021) at 1753. The defense did not address Brewer's initial explanation that his car was at VerValen's house because he had been drinking with VerValen's neighbors.

In rebuttal, the State also addressed the trip with the neighbor for the Christmas tree:

> [PROSECUTOR]: [T]he defendant wants to get his car and doesn't yet apparently know that law enforcement is there and on the scene and then when he discovers that [he] decides, no, yeah, not talking to these people, let's get out of here, and they turn around. So . . . he doesn't come forward at any point, he doesn't say that's my car, he doesn't offer to give any kind of statement about how his car got there. You know, he could have walked up to the first uniformed officer or detective and said, "Hey, that's my car" –

11

[DEFENSE COUNSEL]: Your Honor . . . I'm going to have to object.

THE COURT: The objection is sustained.
Ladies and gentlemen, you are instructed to disregard that last statement by the prosecutor.

[PROSECUTOR]: Okay. Well, let's move on. Just kind of give that some thought.

*Id*. at 1767-68.

Brewer then moved for a mistrial. Defense counsel stated, "A jury just heard that my client should have made statements that he's not obligated to make and there's no explanation for why he didn't make those except for he's guilty." *Id*. at 1786. Brewer argued the comment implicated his right to a fair trial. *Id*. The prosecutor responded that his intent was to "comment on the opportunity and [Brewer's] knowledge that the car was there at the scene." *Id*. at 1787.

The trial court observed that it had sustained the objection and issued a curative instruction. "This Court advised the jury to disregard that comment, so the Court operates under the assumption that the jury will follow the instructions of the Court, [and] they will disregard that comment." *Id*. at 1788. The trial court denied the motion for a mistrial.

E.      Verdict and Sentencing

The jury convicted Brewer of first degree murder and first degree robbery. The jury also entered a special verdict finding that Brewer was armed with a firearm during the commission of both offenses.

Brewer's offender score for the murder was 9 points. At sentencing, the State conceded that the robbery merged with the murder. Brewer was subject to two 120-month firearm enhancements. The trial court imposed a sentence at the high end of the standard range for murder,

548 months, with the two firearm enhancements running consecutively, adding 240 months. The total confinement imposed was 788 months. Brewer appeals.

ANALYSIS

I. MOTION TO SUPPRESS

Brewer argues that the trial court erred by denying his motion to suppress. He contends the affidavit did not establish probable cause that there was "evidence of communications related to the murder" in the phone records. Br. of Appellant at 37. "Instead, the affidavit [spoke] in generalities about how phones are commonly used." *Id*. We disagree.

A.      Scope of Review

As a preliminary matter, Brewer conceded below that pinging his phone for his live location was permissible. The State is also correct that the search of Brewer's Facebook messages and the complete search of his phones were the product of a different warrant that was not challenged below and is not in our record. Brewer does not respond to these arguments, nor does he argue any basis to review the search of Facebook messages and phone contents for the first time on appeal. We exercise our discretion under RAP 2.5(a) to decline to review these issues. This confines our review to the denial of the suppression motion below, which involved cell provider records of texts, call records, and cell site location information associated with two cell phones.

B.      Background on Probable Cause to Support a Warrant

Law enforcement must demonstrate probable cause to secure a search warrant. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Probable cause exists if the affidavit identifies "facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to

be searched." *Id*. The use of "generic classifications" in the probable cause statement will not automatically result in an improper warrant. *State v. Keodara*, 191 Wn. App. 305, 313, 364 P.3d 777 (2015). But "blanket inferences and generalities cannot substitute for the required showing of 'reasonably specific underlying circumstances that establish evidence of illegal activity will likely be found in the place to be searched.'" *Id*. (internal quotation marks omitted) (quoting *Thein*, 138 Wn.2d at 147-48). We review the issuance of a warrant for abuse of discretion, but we review de novo "the trial court's probable cause and particularity determinations on a motion to suppress." *Id*. at 312.

In *Thein*, the Washington Supreme Court held that generalized statements about what drug dealers tend to do was insufficient to support a warrant for a search of the defendant's house. 138 Wn.2d at 148. Similarly, in *Keodara*, a statement that gang members tend to take pictures of themselves before and after committing crimes was insufficient to support a limitless search of the defendant's phone. 191 Wn. App. at 310-11, 317.

In contrast, the Washington Supreme Court recently affirmed the issuance of a warrant for cell site location information when the affidavit showed the defendant possessed the relevant phones both before and after the crime. *State v. Denham*, 197 Wn.2d 759, 768, 489 P.3d 1138 (2021). Denham burgled a jewelry store and sold the proceeds. *Id*. at 763-64. Police secured a warrant for an extensive search of cell phone provider records, including location data and stored communications related to the phones, based in part on an affidavit containing "boilerplate language describing the role of cell phones in people's lives and the information that can be gleaned from the phones and the phone records." *Id*. at 764. On appeal, Denham argued the warrant was based on improper generalizations similar to those in *Thein* and *Keodara*. *Id*. at 768.

14

The Supreme Court disagreed, concluding that the affidavits "present[ed] reasonable grounds to believe that the phones associated with the phone numbers belonged to Denham," because Denham used the phone numbers with his probation officers and various businesses. *Id*. It was also reasonable to believe "that Denham had the phones around the time of the burglary because of specific facts suggesting he had the phones days *before and after* the date in question, that Denham burgled the store, and that Denham trafficked distinctive pieces stolen from the store." *Id.* (emphasis added). The court concluded that "taken together, this is sufficient to raise a reasonable inference that evidence of burglary would be found in the cell site location information." *Id.* "The fact that there are some generalizations in the inferential chain does not defeat the reasonableness of the inference." *Id.* at 768-69. Finally, the Supreme Court held there was probable cause to seek the historical cell site location information because the "affidavits support an inference that Denham had at least one of the cell phones on him when he committed the burglary. That in turn supports an inference that evidence would be found in the [historical] location information for the weekend of the burglary." *Id*. at 768 n.3.

C.      Warrant in the Present Case

Here, the trial court stated that police were seeking evidence of Brewer's location at the time of the homicide. It found a sufficient nexus between that information and the phone records "in light of the fact that it is well known that individuals keep their cell phones on or about their persons at all times, and as a result, a person's location or close location may be determined through the use of cell phone records." VRP (Oct. 7, 2019) at 41. We agree.

The evidence supporting the warrants is similar to that in *Denham*. The affidavit here explained that the murder victim's car had been found at Brewer's house along with weapons and

15

possible stolen property from the victim's house. And a witness told police that Brewer reported killing the car's owner. This was sufficient evidence to link Brewer to the murder. There was also evidence that Brewer used both phones in the days immediately after the murder, and the trial court acknowledged that people tend to keep their phones nearby. The affidavit explained that Brewer's call records and location could corroborate witnesses' statements, including Brewer's explanation of where he was during the murder.

There was a reasonable basis to conclude that the cell site location information from Brewer's phones would provide evidence of Brewer's location at the time of the murder. There was sufficient probable cause and sufficient nexus between the cell phone provider records and evidence of the crime. The trial court did not err by denying the motion to suppress.

## II. SUFFICIENCY OF THE EVIDENCE

Brewer argues there was insufficient evidence for a jury to convict him of first degree burglary or find that he was armed with a firearm during the burglary of Big 5. Even though he concedes that an unloaded firearm is a deadly weapon, he argues that he was not *armed* because trigger locks prevented the guns from being fired during the course of his burglary. We disagree.

A defendant challenging the sufficiency of the evidence admits the State's evidence as true. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). When considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *State v. Frahm*, 193 Wn.2d 590, 595, 444 P.3d 595 (2019).

A.        First Degree Burglary

RCW 9A.52.020(1) states that a person commits first degree burglary if they enter or remain unlawfully within a building with intent to commit a crime therein, and, "in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person." A "deadly weapon" includes in part any "loaded or unloaded firearm." RCW 9A.04.110(6). Any firearm or explosive is a deadly weapon per se. *See In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 366, 256 P.3d 277 (2011) (holding that for other weapons, status as a deadly weapon "rests on the manner in which it is used, attempted to be used, or threatened to be used").

This court has held that sufficient evidence supported a first degree burglary conviction when the deadly weapon was a firearm stolen during the course of the burglary. *State v. Hernandez*, 172 Wn. App. 537, 545, 290 P.3d 1052 (2012) "'[N]o analysis of willingness or present ability to use a firearm as a deadly weapon'" was required to support the conviction. *Id.* at 543 (quoting *Martinez*, 171 Wn.2d at 367). All that is required for a defendant to be armed is for the firearm to be "easily accessible and readily available for use . . . for either offensive or defensive purposes." *Id*. "When the defendant had actual possession of a firearm, sufficient evidence supports a first degree burglary conviction despite the firearm being unloaded and no evidence showing that defendant intended to use it." *Id*. at 543-44.

Here, Brewer conceded that he committed second degree burglary, but disputed whether he was armed with a deadly weapon as needed to find him guilty of first degree burglary. Brewer's argument focused on the trigger locks that prevented the stolen guns from being fired. But Brewer committed the burglary with the aid of bolt cutters that he used to cut through a steel gun rack. The

trigger locks were plastic. Viewing the evidence in the light most favorable to the State, a reasonable factfinder could conclude Brewer could have easily cut the trigger locks off with the bolt cutters. And a detective testified that trigger locks can be opened, even without a key.

In sum, the fact that the trigger locks would have temporarily hampered firing the guns does not prevent a finding that Brewer was armed. We hold that there was sufficient evidence for a reasonable jury to find that Brewer was armed with a deadly weapon for purposes of first degree burglary.

B.      Firearm Sentencing Enhancement

A defendant is subject to a firearm sentencing enhancement "if the offender or an accomplice" for an eligible felony "was armed with a firearm as defined in RCW 9.41.010." RCW 9.94A.533(3).[1] "'Firearm' means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010(12).[2] There is no requirement for a trial court to find a nexus between the firearm and the crime for the purposes of a firearm enhancement "when the charge is first degree burglary and a firearm is stolen." *Hernandez*, 172 Wn. App. at 545.

This court has held that a defendant who possessed an unloaded shotgun and had no ammunition was still armed. *State v. Berrier*, 110 Wn. App. 639, 646, 41 P.3d 1198 (2002). We stated that an "unloaded or even inoperable firearm is still a firearm" under the firearm enhancement statute. *Id*. at 645. And this court recently held that "whether a firearm can be

---

[1] We cite to the current version of the statute because the relevant language has not changed. Murder and first degree burglary are class A felonies subject to firearm sentencing enhancements. *See* RCW 9.94A.533(3)(a); 9A.32.030(2); 9A.52.030(2).

[2] We cite to the current version of the statute because the relevant language has not changed.

rendered operational with reasonable effort and within a reasonable time period is immaterial to whether the firearm is a 'firearm'" under the statute. *State v. Gouley*, 19 Wn. App. 2d 185, 195, 494 P.3d 458 (2021) (distinguishing toy guns from firearms), *review denied*, 198 Wn.2d 1041 (2022).

The firearm sentencing statute does not distinguish between loaded and unloaded or operable and inoperable weapons. Brewer carried four guns out of the store to his car during the burglary. Thus, we hold that there was sufficient evidence to support Brewer's conviction for first degree burglary and the firearm sentencing enhancement.

### III. CONFRONTATION CLAUSE

Brewer argues that the trial court violated his state and federal constitutional rights of confrontation when it found Sortino unavailable and allowed his prior testimony to be read into the record. He contends that it was improper to excuse Sortino without a positive COVID-19 test or any corroboration of his self-diagnosis. Brewer further insists that the error was not harmless and it is likely that a reasonable jury would not have convicted him without Sortino's testimony. We disagree.

Under the invited error doctrine, "a party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal." *In re Det. of Rushton*, 190 Wn. App. 358, 372, 359 P.3d 935 (2015). Here, Brewer's counsel agreed that Sortino was unavailable to testify in person. After considering the challenges of telephonic testimony, counsel agreed that it was preferable to read Sortino's prior testimony into the record, because "Sortino testified subject to my cross-examination" at the previous trial. VRP (Apr. 27, 2021) at 1535. Thus, defense counsel invited any error and waived any confrontation clause challenge by expressly indicating that the

prior cross-examination of Sortino satisfied confrontation requirements. Moreover, the trial court was correct that the witness was unavailable when he described symptoms consistent with COVID-19 in 2021, and the witness had previously testified subject to cross-examination from the defendant's counsel. Admission of Sortino's prior testimony in the second trial did not violate the state or federal constitution.

## IV. MOTION FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT

Brewer contends that the State improperly commented on his prearrest silence during rebuttal closing argument in the second trial, committing prosecutorial misconduct. And he asserts that it is not certain beyond a reasonable doubt that a jury would have convicted him without the comment. We disagree.

We review a denial of a motion for mistrial for abuse of discretion and will reverse only if "no reasonable judge would have reached the same conclusion." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (internal quotation marks omitted). A defendant claiming prosecutorial misconduct must establish that the challenged conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). When the defendant objected to the prosecutor's conduct at trial, the defendant must show that there is a substantial likelihood that the improper remarks affected the jury's verdict. *Emery*, 174 Wn.2d at 760.

"The defendant's burden of establishing prejudice in a prosecutorial misconduct claim is not altered where the challenged conduct 'touched upon the defendants' constitutional rights,' nor does touching on a defendant's constitutional rights render the prosecutor's comments 'per se incurable.'" *Gouley*, 19 Wn. App. 2d at 202 (quoting *Emery*, 174 Wn.2d at 763). "[O]ur supreme court has rejected the use of the constitutional harmless error standard in all but the most egregious

cases of prosecutorial misconduct, such as when the prosecutor appeals to racial bias or prejudice." *Id*. at 204. Otherwise, the jury is presumed to follow the trial court's instructions, "absent evidence proving the contrary." *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

Here, during rebuttal closing argument, the prosecutor commented on Brewer's trip to retrieve his car from VerValen's house after picking up a Christmas tree. He argued that when Brewer saw police at VerValen's house, "[he] decides, no, yeah, not talking to these people, let's get out of here, and [turned] around." VRP (Apr. 29, 2021) at 1767. The prosecutor continued, "[H]e doesn't come forward at any point, he doesn't say that's my car, he doesn't offer to give any kind of statement about how his car got there. You know, he could have walked up to the first uniformed officer or detective and said, 'Hey, that's my car.'" *Id*. Brewer objected and the trial court sustained the objection before instructing the jury to disregard the statement. The prosecutor then said, "Well, let's move on. Just kind of give that some thought." *Id*. at 1768.

Regardless of whether the prosecutor's comment was improper, Brewer cannot show prejudice. Defense counsel objected and the trial court promptly instructed the jury to disregard the statement. Further, as discussed above, the State presented overwhelming evidence that Brewer stole four guns, including the murder weapon police retrieved from a house near where Brewer was hiding. The State also presented evidence that Brewer stole VerValen's tools and car during the window of time in which VerValen was murdered, and that Brewer told at least one person that he had killed VerValen.

Moreover, the trial court denied the motion for a mistrial based on the presumption that a jury will follow curative instructions. This was not an abuse of discretion. Juries are presumed to follow a trial court's curative instructions, and Brewer has not presented evidence to the contrary.

*Kirkman*, 159 Wn.2d at 928. We hold that the trial court did not abuse its discretion by denying the motion for a mistrial.

## V. SAG

A.    Sufficiency of the Evidence for Unlawful Possession of a Firearm

In his SAG, Brewer argues the State failed to prove he had control over the firearms, as necessary to support his three convictions for unlawful possession of a firearm. He insists that no witness testified that he possessed the firearms and contends that the search that found the murder weapon was improper.

As stated above, a challenge to the sufficiency of the evidence admits the truth of the State's evidence and allows us to draw all reasonable inferences in favor of the State. A person is guilty of unlawful possession of a firearm in the first degree if they own, possess, or control "any firearm after having previously been convicted . . . of any serious offense." RCW 9.41.040(1)(a).[3]

The parties stipulated that Brewer had previously committed a serious offense that made possession of a firearm illegal. The State presented evidence at trial that Brewer stole four guns from Big 5. Two of the guns were recovered from Brewer's garage. A third was found hidden in a house belonging to friends of Brewer who did not own firearms and consented to the search of their house. Brewer was arrested in the woods next to this house. Brewer's trial counsel admitted in closing argument that Brewer's conduct constituted second degree burglary and four counts of theft of a firearm. Viewing the evidence in the light most favorable to the State, a reasonable jury could find that Brewer possessed three firearms after being previously convicted of a serious offense. We affirm Brewer's three convictions for unlawful possession of a firearm.

---

[3] We cite to the current version of the statute because the relevant language has not changed.

B.      Same Criminal Conduct

Brewer also argues that his offender score is incorrect. He reasons that because the charges were under a single cause number, they constitute the same criminal conduct.

Brewer's offender score for the murder was 9 points. Brewer had two prior convictions for second degree assault and residential burglary. The prior residential burglary added 1 point to Brewer's offender score for the murder, while the assault added 2 points. *See* RCW 9.94A.030(58)(viii), .525(8).[4] He also had 1 point for two of the unlawful possession of a firearm charges and 1 point for the four theft of a firearm charges.[5] The remaining unlawful possession of a firearm, malicious mischief, and possession of a stolen vehicle charges together added 3 points. Finally, the burglary added 1 point to Brewer's offender score for the murder, for a total of 9 points.

Defense counsel agreed with the State's calculation of the standard range for the murder. Trial counsel never contended and Brewer does not now demonstrate that his offender score was calculated incorrectly.

CONCLUSION

We affirm Brewer's convictions and sentence.

---

[4] We cite to the current version of both statutes because the relevant language has not changed.

[5] The trial court found that the unlawful possession of a firearm charges counts all constituted the same criminal conduct.

No. 55821-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Cruser, A.C.J.

24